**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | |
|---|---|
| **RANDY B. CARTER,** ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> **MICHAEL J. ASTRUE,** ) <br> **Commissioner of Social Security,** ) <br> ) <br> Defendant. ) <br> ) | **CIVIL NO. 3:10CV510** |

## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

This matter is before the Court for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) on cross-motions for summary judgment.[1] Plaintiff, Randy Carter, seeks judicial review pursuant to 42 U.S.C. § 405(g) of the final decision of Defendant Commissioner denying his applications for Social Security Disability ("DIB") and Supplemental Security Income payments ("SSI"). The Commissioner's final decision is based on a finding by an Administrative Law Judge ("ALJ") that Plaintiff was not disabled as defined by the Social Security Act ("the Act") and applicable regulations.

For the reasons discussed herein, it is the Court's recommendation that Plaintiff's motion for summary judgment (docket no. 11) and motion to remand (docket no. 12) be DENIED; that

---

[1] The administrative record in this case has been filed under seal, pursuant to Local Civil Rules 5 and 7(C). In accordance with these Rules, the Court will endeavor to exclude any personal identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth (except for year of birth), and any financial account numbers from its consideration of Plaintiff's arguments and will further restrict its discussion of Plaintiff's medical information to only the extent necessary to properly analyze the case.

Defendant's motion for summary judgment (docket no. 14) be GRANTED; and that the final decision of the Commissioner be AFFIRMED.

## I. PROCEDURAL HISTORY

Plaintiff protectively filed his current applications for DIB and SSI on September 7, 2007, claiming disability due to lupus, arthritis, sleep apnea, problems with his right foot, high blood pressure, and sarcoidosis[2]. (R. at 116.) Initially, Plaintiff alleged that the disability's onset date was July 24, 2007. (R. at 89.) The date was amended, however, to January 15, 2008, to correspond with the first full month in which Plaintiff was not employed. (R. at 31, 33.). The Social Security Administration ("SSA") denied Plaintiff's claims initially and on reconsideration.[3] (R. at 48-52; 55-59.) On February 25, 2009, accompanied by counsel, Plaintiff testified before an ALJ. (R. at 23-39.) On June 25, 2009, the ALJ denied Plaintiff's application, finding that he was not disabled under the Act where, based on his age, education, work experience and residual functional capacity, there are jobs he could perform which exist in significant numbers in the national economy. (R. at 18, 21-22.) The Appeals Council subsequently denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner subject to judicial review by this Court. (R. at 1-3.)

---

[2] "Sarcoidosis is characterized by the development and growth of tiny clumps of inflammatory cells… most commonly in the lungs, lymph nodes, eyes, and skin." MayoClinic.com, http://www.mayoclinic.com/health/sarcoidosis/DS00251 (last visited May 24, 2011).

[3] Initial and reconsideration reviews in Virginia are performed by an agency of the state government - the Disability Determination Services (DDS), a division of the Virginia Department of Rehabilitative Services - under arrangement with the SSA. 20 C.F.R. Part 404, Subpart Q; see also § 404.1503. Hearings before administrative law judges and subsequent proceedings are conducted by personnel of the federal SSA.

## II. QUESTION PRESENTED

Is the Commissioner's decision that Plaintiff is not entitled to benefits supported by substantial evidence on the record and the application of the correct legal standard?

## III. STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, the Court is limited to determining whether the Commissioner's decision was supported by substantial evidence on the record and whether the proper legal standards were applied in evaluating the evidence. Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005); Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is more than a scintilla, less than a preponderance, and is the kind of relevant evidence a reasonable mind could accept as adequate to support a conclusion. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971); Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)).

In order to find whether substantial evidence exists, the Court is required to examine the record as a whole, but it may not "'undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the Secretary.'" Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (quoting Craig, 76 F.3d at 589). In considering the decision of the Commissioner based on the record as a whole, the Court must "'take into account whatever in the record fairly detracts from its weight.'" Breeden v. Weinberger, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1951)). The Commissioner's findings as to any fact, if the findings are supported by substantial evidence, are conclusive and must be affirmed. Perales, 402 U.S. at 390. While the standard is high, if the ALJ's determination is not supported by substantial evidence on the record, or if the ALJ has

made an error of law, the district court must reverse the decision. Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

A sequential evaluation of a claimant's work and medical history is required in order to determine if a claimant is eligible for benefits. 20 C.F.R. §§ 416.920, 404.1520; Mastro, 270 F.3d at 177. The analysis is conducted for the Commissioner by the ALJ, and it is that process that a court must examine on appeal to determine whether the correct legal standards were applied, and whether the resulting decision of the Commissioner is supported by substantial evidence on the record.

The first step in the sequence is to determine whether the claimant was working at the time of the application and, if so, whether the work constituted "substantial gainful activity" (SGA).[4] 20 C.F.R. §§ 416.920(b), 404.1520(b). If a claimant's work constitutes SGA, the analysis ends and the claimant must be found "not disabled," regardless of any medical condition. Id. If the claimant establishes that he did not engage in SGA, the second step of the analysis requires him to prove that he has "a severe impairment . . . or combination of impairments which significantly limit[s] [his] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c); see also 20 C.F.R.404.1520(c). In order to qualify as a severe impairment that entitles one to benefits under the Act, it must cause more than a minimal effect on one's ability to function. 20 C.F.R. § 404.1520(c). At the third step, if the claimant has an impairment that meets or equals an impairment listed in 20 C.F.R. Part 404, Subpart P,

---

[4] SGA is work that is both substantial and gainful as defined by the Agency in the C.F.R. Substantial work activity is "work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." 20 C.F.R. c 404.1572(a). Gainful work activity is work activity done for "pay or profit, whether or not a profit is realized." 20 C.F.R. c 404.1572(b). Taking care of oneself, performing household tasks or hobbies, therapy or school attendance, and the like, are not generally considered substantial gainful activities. 20 C.F.R. § 404.1572(c).

Appendix 1 (listing of impairments) and lasts, or is expected to last, for twelve months or result in death, it constitutes a qualifying impairment and the analysis ends. 20 C.F.R. §§ 416.920(d), 404.1520(d). If the impairment does not meet or equal a listed impairment, then the evaluation proceeds to the fourth step in which the ALJ is required to determine whether the claimant can return to his past relevant work[5] based on an assessment of the claimant's residual functional capacity ("RFC")[6] and the "physical and mental demands of work [the claimant] has done in the past." 20 C.F.R. §§ 416.920(e), 404.1520(e). If such work can be performed, then benefits will not be awarded. Id. However, if the claimant cannot perform his past work, the burden shifts to the Commissioner at the fifth step to show that, considering the claimant's age, education, work experience, and RFC, the claimant is capable of performing other work that is available in significant numbers in the national economy. 20 C.F.R. §§ 416.920(f), 404.1520(f); Powers v. Apfel, 207 F.3d 431, 436 (7th Cir. 2000) (citing Bowen v. Yuckert, 482 U.S. 137, 146, n.5 (1987)); Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The Commissioner can carry his burden in the final step with the testimony of a vocational expert ("VE"). When a VE is called to testify, the ALJ's function is to pose hypothetical questions that accurately represent the claimant's RFC based on all evidence on record and a fair description of all the claimant's impairments so that the VE can offer testimony about any jobs existing in the national economy

---

[5] Past relevant work is defined as SGA in the past fifteen years that lasted long enough for an individual to learn the basic job functions involved. 20 C.F.R. §§ 416.965(a), 404.1565(a).

[6] RFC is defined as "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR-96-8p. When assessing the RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. Id. (footnote omitted).

that the claimant can perform. Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989). Only when the hypothetical posed represents *all* of the claimant's substantiated impairments will the testimony of the VE be "relevant or helpful." Id. If the ALJ finds that the claimant is not capable of SGA, then the claimant is found to be disabled and is accordingly entitled to benefits. 20 C.F.R. §§ 416.920(f)(1), 404.1520(f)(1).

### IV. ANALYSIS

The ALJ found at step one that Plaintiff had not engaged in SGA since the alleged onset of his disability. (R. at 12.) At steps two and three, the ALJ found that Plaintiff had the severe impairments of non-erosive arthritis, possible systemic lupus erythematosus ("SLE")[7], residuals of a left fourth finger injury, history of right plantar fasciitis[8], history of sarcoidosis, and sleep apnea, but that these impairments did not meet or equal any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1, as required for the award of benefits at that stage. (R. at 12-18.) The ALJ next determined that Plaintiff had the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b), except that he can only occasionally reach, handle, and grasp with the right hand; is restricted to occasional bending, stooping, and squatting; can lift/carry twenty pounds occasionally and ten pounds frequently; can stand/walk about six hours in an eight hour

---

[7] SLE is a "chronic, inflammatory multisystemic disorder of connective tissue that proceeds through remissions and relapses; it may either be acute or insidious in onset and is characterized principally by involvement of the skin, joints, kidneys, and serosal membranes… The condition is marked by a wide variety of abnormalities including arthritis, arthralgias, nephritis, central nervous system manifestations, pleurisy, pericarditis, leukopenia or thrombocytopenia, hemolytic anemia, an elevated erythrocyte sedimentation rate, and the presence in the blood of distinctive cells called LE cells." Dorland's Illustrated Medical Dictionary 1095 (31st ed. 2007).

[8] Fasciitis is the inflammation of a sheet or band of fibrous tissue such as lies deep to the skin or forms an investment for muscles and various other organs of the body. Dorland's Illustrated Medical Dictionary 687, 692 (31st ed. 2007). Plantar fasciitis pertains to the sole of the foot. Id. at 476.

workday; can sit about six hours in an eight hour workday; can frequently reach, handle, and grasp with his left hand; but has no other significant postural, manipulative, visual, communicative, or environmental limitations. (R. at 18-20.)

The ALJ then determined at step four of the analysis that Plaintiff could not perform his past relevant work as a cook because of the level of exertion required in the position. (R. at 21.) At step five, after considering Plaintiff's age, education, work experience, and RFC, and after consulting a VE, the ALJ nevertheless found that there are other occupations which exist in significant numbers in the national economy that Plaintiff could perform. (R. at 21-22.) Specifically, the ALJ found that Plaintiff could work as a counter clerk, information clerk, or personal care worker. (R. at 22.) Accordingly, the ALJ concluded that Plaintiff was not disabled and was employable such that he was not entitled to benefits. (R. at 22.)

Plaintiff moves for a finding that he is entitled to benefits as a matter of law, or in the alternative, he seeks reversal and remand for additional administrative proceedings. (Pl.'s Mot. for Summ. J.) In support of his position, Plaintiff argues that the ALJ erred in: (1) discounting Plaintiff's complaints of pain; (2) failing to properly weigh the opinions of Plaintiff's treating physicians; (3) failing to include all of Plaintiff's restrictions in determining Plaintiff's residual functional capacity; and (4) failing to include side effects of Plaintiff's medicines in his RFC analysis. (Pl.'s Mem. in Supp. of Mot. for Summ. J. ("Pl.'s Mem.") at 22-29.) Defendant argues in opposition that the Commissioner's final decision is supported by substantial evidence and application of the correct legal standard such that it should be affirmed. (Def.'s Mot. for Summ. J. and Br. in Supp. Thereof ("Def.'s Mem.") at 12-20.)

**A. The ALJ properly assessed Plaintiff's credibility.**

Plaintiff alleges that the ALJ erred by discounting his subjective complaints of pain. (Pl.'s Mem. at 23.) After step three of the ALJ's sequential analysis, but before deciding whether a claimant can perform past relevant work at step four, the ALJ must determine the claimant's RFC. 20 C.F.R. §§ 416.920(e)-(f), 416.945(5)(1). The RFC must incorporate impairments supported by the objective medical evidence in the record and those impairments that are based on the claimant's credible complaints. In evaluating a claimant's subjective symptoms, the ALJ must follow a two-step analysis. Craig v. Charter, 76 F.3d 585, 594 (4th Cir. 1996); see also SSR 96-7p; 20 C.F.R. §§ 404.1529(a) and 416.929(a). The first step is to determine whether there is an underlying medically determinable physical or mental impairment or impairments that reasonably could produce the individual's pain or other related symptoms. Id.; SSR 96-7p, at 1-3. The ALJ must consider all the medical evidence in the record. Craig, 76 F.3d at 594-95; SSR 96-7p, at 5, n.3; see also SSR 96-8p, at 13 (specifically stating that the "RFC assessment must be based on *all* of the relevant evidence in the case record") (emphasis added). If the underlying impairment reasonably could be expected to produce the individual's pain, then the second part of the analysis requires the ALJ to evaluate a claimant's statements about the intensity and persistence of the pain and the extent to which it affects the individual's ability to work. Craig, 76 F.3d at 595. The ALJ's evaluation must take into account "all the available evidence," including a credibility finding of the claimant's statements regarding the extent of the symptoms, and the ALJ must provide specific reasons for the weight given to the individual's statements. Craig, 76 F.3d 595-96; SSR 96-7p, at 5-6, 11.

This Court must give great deference to the ALJ's credibility determinations. See Eldeco, Inc. v. NLRB, 132 F.3d 1007, 1011 (4th Cir. 1997). The Court of Appeals for the Fourth Circuit, as the controlling appellate authority, has determined that "[w]hen factual findings rest upon

credibility determinations, they should be accepted by the reviewing court absent 'exceptional circumstances.'" Id. (quoting NLRB v. Air Prods. & Chems., Inc., 717 F.2d 141, 145 (4th Cir. 1983)). Therefore, this Court must accept the ALJ's factual findings and credibility determinations unless "'a credibility determination is unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all.'" Id. (quoting NLRB v. McCullough Envtl. Servs., Inc., 5 F.3d 923, 928 (5th Cir. 1993)).

Furthermore, it is well established that Plaintiff's subjective allegations of pain are not, alone, conclusive evidence that Plaintiff is disabled. See Mickles v. Shalala, 29 F.3d 918, 919 (4th Cir. 1994). The Fourth Circuit has determined in this regard that "subjective claims of pain must be supported by objective medical evidence showing the existence of a medical impairment which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." Craig, 76 F.3d at 591.

In the instant case, the ALJ determined that Plaintiff's medically determinable impairments reasonably could produce his pain and other related symptoms; however, the ALJ concluded that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the… residual functional capacity assessment." (R. at 19.) The ALJ thoroughly analyzed Plaintiff's history of doctor's visits, treatment, and "follow up" appointments. He noted that the records do not indicate that Plaintiff visited the hospital or emergency room for treatment during the period at issue. (R. at 19-20.) He based most of his analysis on notes from Plaintiff's doctors as well as Plaintiff's self-evaluation of his daily activities.

Records of nine monthly visits to Dr. Jessee, Plaintiff's arthritis specialist, from October 2006 to October 2007, consistently indicate that Plaintiff was negative for symptoms of active

9

SLE including rash, mouth sores, fever, and gastrointestinal ("GI") upset. (R. at 181-193, 290.) In his opinions and recommendations to another treating physician of Plaintiff's (Dr. Corbett) after a June 15, 2007 appointment with Plaintiff, Dr. Jessee noted that Plaintiff "had excellent proximal muscle strength." (R. at 185.) He also noted that Plaintiff had paresthesia involving the left hip, but opined that it is related to "the way he stands." (R. at 185.) Further, he noted that Plaintiff did not think that the paresthesia had worsened. (R. at 185.) Subsequently, Dr. Jessee noted specifically on October 1, 2008 that Plaintiff did not demonstrate symptoms of active lupus. (R. at 340.)

The ALJ also discussed Plaintiff's last appointment of record with Dr. Jessee where the doctor found no evidence of symptoms attributed to SLE or arthritis. (R. at 20.) The visit occurred on November 25, 2008, with the doctor noting that Plaintiff's "labs have done well and [Plaintiff] is relatively stable. I believe [Plaintiff] could return to see us every three months rather than every two months." (R. at 342.) Almost one year prior, on December 27, 2007, Dr. Jessee filled out a questionnaire noting that Plaintiff's "disease [was] not responding well to medical treatment." (R. at 322.) However, eight days earlier, Plaintiff's finger surgeon indicated in an office consult that physical examination of Plaintiff revealed a "male in no distress" and that his SLE was under treatment and was in good control. (R. at 302.) Such records imply that Plaintiff's condition had improved, or had been under control between December 2007 and November 2008, not that his condition had deteriorated.

The ALJ also determined that Plaintiff's employment history through January 24, 2008 and record of daily activities, including weekly church attendance, visits with his children, and going outside daily, "suggest[ed] a greater level of functioning than alleged and demonstrate the capacity to perform work at least at the light level of exertion." (R. at 20.) In a pain

10

questionnaire completed September 20, 2007, Plaintiff listed pain in his lower back, ankles, feet, knees, arms, and hands; and that such pain "moves around depending on what part of body is being used." (R. at 105.) However, in a function report completed on the same day, Plaintiff's listed activities included driving to and from work, mowing the grass, assisting with feeding dogs, and attending church regularly. (R. at 107-09, 111.) He explained in the assessment that while he can drive, he could not drive at the time due to his foot surgery. (R. at 101.) On December 31, 2007, at Plaintiff's initial hand therapy visit following his finger surgery, he reported to the doctor that he returned home from church the day before and that he struck his finger on a storm door. (R. at 308.) The statement is evidence of Plaintiff's mobility and level of activity as late as one month prior to his alleged disability onset date. The record further indicates that in October 2007, three months before the alleged onset date, Plaintiff indicated that he "believe[d] his disease [SLE] is tolerable at this point," and Plaintiff accordingly chose not to increase his dose of Methotrexate despite a doctor's recommendation. (R. at 289.) Finally, Plaintiff drove himself to the hearing before the ALJ on February 25, 2009, indicating that his ability to drive had improved since his foot surgery, and that it had not deteriorated from 2007 to 2009. (R. at 27.) Simply stated, the record indicates that the ALJ evaluated all of the available evidence in making his credibility assessment of the persistence, intensity, and limiting effects of Plaintiff's impairments. Accordingly, substantial evidence supports the ALJ's decision that Plaintiff's subjective complaints of pain were not supported by the objective evidence of record. The Court therefore recommends that the ALJ's finding should be affirmed in this regard.

**B. The ALJ properly weighed the opinions of Plaintiff's treating physicians and the opinions of the consulting physician.**

Plaintiff contends that "it was irrational and reversible error for the ALJ to discount the opinions of the treating physicians in this case." (Pl.'s Mem. at 23.) Plaintiff specifically

11

challenges the ALJ's decision not to accept the limitations advanced by his treating physicians. Citing Hines v. Barnhart, Plaintiff relies on his relationships with his treating physicians, which were initiated four years prior to the alleged disability onset date, as evidence that their opinions were entitled to greater weight than assigned by the ALJ. 453 F.3d 559, 564 (4th Cir. 2006) (citing Johnson v. Barnhart, 434 F.3d 650, 654 (4th Cir. 2005) (noting that "[c]ourts typically accord greater weight to the testimony of a treating physician because the treating physician has necessarily examined the applicant and has a treatment relationship with the applicant.")); R. at 23, 28.

During the sequential analysis, when the ALJ determines whether the claimant has a medically-determinable severe impairment, or combination of impairments which would significantly limit the claimant's physical or mental ability to do basic work activities, the ALJ must analyze the claimant's medical records that are provided and any medical evidence resulting from consultative examinations or medical expert evaluation that have been ordered. See 20 C.F.R. § 416.912(f). When the record contains a number of different medical opinions, including those from the Plaintiff's treating physician(s), consultative examiners or other sources that are consistent with each other, then the ALJ makes a determination based on that evidence. See 20 C.F.R. § 416.927(c)(2). If, however, the medical opinions are inconsistent internally with each other, or other evidence, the ALJ must evaluate the opinions and assign them respective weight to properly analyze the evidence involved. 20 C.F.R. § 416.927(c)(2), (d). Under the applicable regulations and case law, a treating physician's opinion must be given controlling weight if it is well-supported by medically-acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. Craig, 76 F.3d at 590; 20 C.F.R. § 416.927(d)(2); SSR 96-2p. However, the regulations do not require that the

ALJ accept opinions from a treating physician in every situation, e.g., when the physician opines on the issue of whether the claimant is disabled for purposes of employment (an issue reserved for the Commissioner), or when the physician's opinion is inconsistent with other evidence, or when it is not otherwise well supported. Jarrells v. Barnhart, No. 7:04-CV-00411, 2005 WL 1000255, at *4 (W.D. Va. Apr. 26, 2005). See 20 C.F.R. § 404.1527(d)(3)-(4), (e).

In assessing the opinions of the treating and consulting physicians, the ALJ noted that the examinations by the treating physicians "did not indicate significantly decreased strength, sensation, or range of motion of any extremity, as would be expected with the degree of limitation expected." (R. at 20.) In light of the absence of support for such extreme limitations, the ALJ afforded "no significant weight" to Drs. Jessee and Corbett's opinions. (R. at 20, 318-22, 334-38.) In reaching his conclusion that the treating physicians' opinions were not consistent with the other objective evidence of record, the ALJ reviewed the treating physicians' findings at various appointments, as well as the treatment regimens they prescribed. (R. at 13, 19-20.)

In a questionnaire completed December 27, 2007, Dr. Jessee indicated that Plaintiff did not satisfy the diagnostic criteria for SLE, because he had only two signs and symptoms identified by the American College of Rheumatology, when four are required for a definitive diagnosis of SLE. (R. at 318.) Nevertheless, Dr. Jessee indicated in the same report that Plaintiff "[had] severe joint pain and soreness that prevent concentration," which rendered him incapable of even "low stress" jobs. (R. at 320.) Dr. Jessee also indicated that during an eight-hour work day, Plaintiff would never be able to stoop or crouch; use his hands to grasp, turn, or twist objects; or use his fingers for fine manipulations. (R. at 321.)

Dr. Corbett's report also indicated that Plaintiff was incapable of low stress jobs, crouching, or climbing stairs. (R. at 335-37.) Dr. Corbett assessed Plaintiff's ability to use his

13

right hand to grasp, turn, twist, and reach at seventy percent; and use of the fingers of his right hand for fine manipulations at seventy percent during an eight-hour work day. (R. at 337.) Though the evaluations of Drs. Jessee and Corbett corroborate each other, neither provided objective tests similar to the range of motion testing conducted by Dr. Newell, the consulting physician for the state agency. (R. at 279.) The ALJ noted that the treating physician's examinations "did not indicate significantly decreased strength, sensation, or range of motion of any extremity, as would be expected with the degree of range of limitation reported." (R. at 20.)

In October 2006, Dr. Jessee stated that despite an SLE flare up, he could not "find anything to inject and [Plaintiff] had no tendonitis of the elbow." (R. at 193.) In March 2007, Dr. Jessee noted that "right middle finger sticks, but not as bad as before. Grip weak sometimes and drops things sometimes." (R. at 189.) In April 2007, Dr. Jessee wrote that Plaintiff had no swelling and no weakness. (R. at 187.) In June and August 2007, Dr. Jessee noted that Plaintiff had 4+ proximal strength. (R. at 182, 184.) Dr. Jessee also opined that increasing Plaintiff's dose of Methotrexate "has significantly helped his hands and he has less pain all over." (R. at 185.) Dr. Jessee also wrote that Plaintiff "had excellent proximal muscle strength." (R. at 185.) The evidence of record therefore indicates that Plaintiff's condition generally improved over time between October 2006 and August 2007.

The ALJ instead found Dr. Newell's evaluation to be comprehensive in comparison to the evaluations of Plaintiff's treating physicians. Dr. Newell interviewed Plaintiff for a history of his present illness, the impact on his activities of daily living, and his social and family histories in October 2007. (R. at 274-75.) Dr. Newell completed a physical examination and assessed Plaintiff's coordination, station, and gait. (R. at 276.) He also completed a range of motion assessment that revealed near-normal results for Plaintiff's range of motion of his shoulder,

hand-finger, elbow, knee, ankle, and wrist joints. (R. at 274-79.) Dr. Newell's final assessment indicated that, among other abilities, Plaintiff could stand and walk in an eight-hour workday for six hours; that he could sit for eight hours; that he could lift/carry ten pounds on a frequent basis and occasionally carry twenty pounds. (R. at 278.) The ALJ determined that Dr. Newell's assessment of Plaintiff's residual functional capability was consistent with the other objective medical evidence of record. (R. at 20.) The ALJ also found Dr. Newell's assessment credible because two state agency physicians who are experts in disability evaluation affirmed his findings. (R. at 20.) For those reasons, he accorded Dr. Newell's conclusions considerable weight. (R. at 20.) Upon review of the record, the ALJ's assessment of the evaluations of the treating physicians and consulting physician, and his subsequent assignment of weight to each, is supported by substantial evidence and application of the correct legal standards.

### C. The ALJ properly evaluated the full range of Plaintiff's limitations.

Plaintiff further argues that the ALJ failed to analyze the full range of Plaintiff's limitations in his RFC analysis by neglecting to consider the limitations listed by Plaintiff's treating physicians regarding his level of concentration; limitations on his ability to stand, walk and sit; the need for unexpected breaks during a work day; and lifting restrictions. (Pl.'s Mem. at 28.) However, as already discussed, substantial evidence supports the ALJ's decision not to adopt the treating physicians' opinions. Furthermore, the ALJ properly evaluated Plaintiff's credibility and only included those limitations in the RFC which he found to be credible and supported by the evidence of record. The ALJ was not, therefore, required to include any limitations in the RFC that were not well supported. Accordingly, it is this Court's recommendation that the ALJ's RFC analysis is supported by substantial evidence and should be affirmed.

### D. Substantial evidence supports the ALJ's decision not to include the alleged side effects of Plaintiff's medications in his RFC analysis.

Finally Plaintiff argues that the ALJ erred in failing to evaluate the side effects of Plaintiff's medications, namely drowsiness, vision loss, and memory loss, in arriving at his RFC determination. (Pl.'s Mem. at 29.) Here, the ALJ's decision to exclude an analysis of Plaintiff's complaints of memory and vision loss in his RFC assessment is supported by substantial evidence and application of the correct legal standards because the ALJ determined at step two that the record did not support a finding that these complaints constituted severe impairments. Though the ALJ neglected to address Plaintiff's vision or memory in the specific context of side effects of his medications, the ALJ did evaluate the objective medical record for indications of a severe visual impairment and a severe mental impairment and incorporated Plaintiff's complaints into those analyses.

The ALJ noted that the consulting physician's evaluation of Plaintiff provided objective evidence in the form of a Snellen eye exam, which indicated that Plaintiff's vision was 20/20 bilaterally. (R. at 276.) In determining whether Plaintiff had a severe mental impairment, the ALJ noted the consulting physician's observations that Plaintiff was "alert and oriented times three" and had "normal memory and concentration." (R. at 16, 276.) Further, the ALJ stated that Plaintiff "needs no reminders for personal needs or grooming, to take medicines, or to go places." (R. at 16.) Based on the objective evidence presented on Plaintiff's vision and memory, the ALJ concluded that Plaintiff did not have a severe visual or mental impairment. (R. at 15.) Therefore, the ALJ's finding that Plaintiff did not have a severe visual or mental limitation is supported by substantial evidence and application of the correct legal standards.

Plaintiff also alleges that the ALJ failed to include an analysis of drowsiness as a side effect of the Plaintiff's medications. (Pl.'s Mem. at 29.) However, the record fails to indicate

that Plaintiff complained of drowsiness as a result of taking his medications. Further, Plaintiff himself did not list drowsiness as a side effect caused by his medication in a pain questionnaire dated September 20, 2007. (R. at 106.) Neither did he mention it in a function report of the same date. (R. at 107-14.) Finally, in response to the question "What have these doctors told you about your condition?" on a medical treatment questionnaire processed December 10, 2008, Plaintiff wrote "[m]edications side effects causes… sleepness [sic] a lot." (R. at 146.) Thus, the record reflects no subjective complaint that Plaintiff actually *experienced* the possible side effects of his medication regimen.

Further, the record does not indicate that Plaintiff received treatment for drowsiness or fatigue. Plaintiff's treating physician listed "fatigue" on a questionnaire dated December 27, 2007, in response to a question asking him to "[i]dentify prescribed medications… and the side effects of any medication… which *may* have implications for working." (R. at 320, emphasis added.) Listing fatigue as a general side effect which may have implications for employment does not demonstrate that Plaintiff had complained of the side effect, or that he was seeking treatment for it. The record, therefore, simply establishes that drowsiness is a potential, general side effect of the medicines that were prescribed. However, Plaintiff himself had not complained of drowsiness as a result of taking his medications. Furthermore, the Fourth Circuit has recognized that "'[d]rowsiness often accompanies the taking of medication, and it should not be viewed as disabling unless the record references serious functional limitations.'" Johnson v. Barnhart, 434 F.3d 650, 6589 (4th Cir. 2005) (quoting Burns v. Barnhart, 312 F.3d 113, 131 (3d Cir. 2002)). Consequently, the Court recommends that the ALJ's decision to exclude drowsiness from his evaluation of Plaintiff's impairments is supported by substantial evidence and application of the correct legal standards.

## V. CONCLUSION

Based on the foregoing analysis, it is the recommendation of this Court that Plaintiff's motion for summary judgment (docket no. 13) and motion to remand (docket no. 14) be DENIED; that Defendant's motion for summary judgment (docket no. 18) be GRANTED; and, that the final decision of the Commissioner be AFFIRMED.

Let the Clerk forward a copy of this Report and Recommendation to the Honorable Robert E. Payne and to all counsel of record.

### NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a <u>de novo</u> review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.**

/s/
DENNIS W. DOHNAL
UNITED STATES MAGISTRATE JUDGE

Date: June 23, 2011
Richmond, Virginia